Suzanne Reier TRUITT, et al., Appellants,

v.

EVANGEL TEMPLE, INC., Appellee.

No. 84–275.

District of Columbia Court of Appeals.

Argued Oct. 9, 1984.

Decided Dec. 11, 1984.

Susan Isaacs, Washington, D.C., for appellants.

Michael A. Schuchat, Washington, D.C., for appellee.

Before TERRY and ROGERS, Associate Judges, and GALLAGHER, Associate Judge, Retired.

ROGERS, Associate Judge.

On appeal appellants-landlords contend the trial court erred in holding that they were not entitled to recover $14,000 for rent which accrued during an eight-month period in which the property was vacant as a result of appellee's alleged wrongful abandonment. Appellants argue that a landlord's termination of a lease does not terminate a tenant's liability for past due rent. The trial court found that the rent received by appellants from a substitute tenant exceeded the rent called for in the original lease and, therefore, appellants have suffered no damages. We affirm.

I.

Appellants and appellee signed a five year, eleven month lease effective June 1, 1978 for a former warehouse at 606–608 Rhode Island Avenue, N.E. adjacent to the appellee Evangel Temple. The rental for the first eleven months (June 1, 1978–May 1, 1979) was $1,400 per month ($15,400 for eleven months); thereafter (May 1, 1979–May 1, 1984) the monthly rental was $1,750

($21,000 annually). The lease contained the following provisions:

Paragraph 3:

> The leased premises shall be used by Lessee for office meeting rooms, classes, etal [sic] with all the services, functions, rights and duties normally conducted in connection with the operation of such an organization as Evangel Temple, Inc.

Paragraph 21:

> Automobile parking by the Lessee, its agents, employees and customers, shall be restricted to two (2) spaces in front of number 608 Rhode Island Avenue (twenty feet (20′)) and beyond the east line of the door of building 604 Rhode Island Avenue, except for one (1) eight (8) foot space allotted to the Firestone Company; provided, however, that said spaces shall not block the entrance to the warehouse doors of the leased premises.

Paragraph 25:

> This Lease Agreement and any and all terms hereof are expressly conditioned upon the obtaining by Lessee of an Occupancy Permit, whereunder Lessee may use the premises for the purposes set forth in paragraph 3 above. In the event the said Occupancy Permit is not obtainable, it is understood and agreed that this Lease Agreement and all its terms, conditions and provisions, shall, at the option of the Lessee, become null and void and of no effect.

The undisputed facts are that appellee filed an application for a certificate of occupancy for the subject premises on April 13, 1979, stating its proposed use as "Church Related Activities—Public Assembly; Seating 2,000 or more." The application for a certificate of occupancy was disapproved on May 2, 1979 by the District of Columbia Department of Housing and Community Development because of the failure to meet the off-street parking requirements. After giving notice to appellants, appellee vacated the premises prior to the end of May, 1979; all rents through May 31, 1979 had been paid. On January 26, 1980, appellants entered into a five year lease with a new tenant, Litho Lab, Inc., to lease the property from February 1, 1980 through January 31, 1985 at an annual rental of $27,000, payable in monthly installments of $2,250. Under the terms of the new lease, appellants would receive $6,000 more per year than they would have received under the terms of the lease with appellee.

Appellants sued on May 14, 1980 to recover from appellee unpaid rent in the amount of $21,000 and for breach of contract, claiming damages in the amount of $20,000. Appellants alleged appellee did not diligently or in good faith pursue the necessary permits in accordance with the understood terms of the lease.[1] At trial appellants stipulated that they were only claiming $14,000 for the rent which was not paid from June, 1979 through January, 1980. The trial court found:

> In the instant case, the portion of the original lease with which we are concerned would have given the landlord a total of $105,000 from May 1, 1979 until May 1, 1984. The lease with Litho Lab, Inc. will total $135,000 over five years ending January 31, 1985. They have already paid, as of December 1, 1983, 47 months of rent at $2250 a month—and a total of $105,750. By the time the first lease would have terminated, three months from now, another $9,000 will have accrued to the landlord for a total of $114,750. The landlord will thus have gained $9,750 more rent from the premises than if the original lease had remained in force.

> Plaintiff claims and has produced exhibits of $3037.50 for real estate commission, $17.76 to the Washington Post and $40 to Artco Studios for installation of a

1. In denying the certificate of occupancy because of the lack of parking, the Department of Housing & Community Development advised appellee that the Temple could apply to the Board of Zoning Adjustment for a variance from the off-street parking requirement.

sign in the summer of 1979. The total of $3,095.26 is adequately covered by the additional rent plaintiff has gained; accordingly it is unnecessary to decide the issue of whether the lease has in fact been breached. Whether it has or not, plaintiff has suffered no damages and is not entitled to any moneys from defendant.

## II.

▬ Of appellants' contentions on appeal, we need only consider whether the trial court erred in defining the proper measure of appellants' damages.[2] Appellants contend the trial court erred in ruling the proper measure of damages was contract damages and not the accrued rent. They rely on *Cohen v. Food Town, Inc.*, 207 A.2d 122, 124 (D.C.1965), where the court noted that a lease is not an ordinary bilateral contract but primarily a conveyance of an estate for years in real estate, under which a landlord has the right to sue for each installment of rent as it becomes due.

▬ It has long been established in the District of Columbia that a landlord has three options for dealing with tenants who wrongfully abandon the premises and repudiate their leases:

[1] [the landlords] could accept the abandonment and thereby terminate the lease; [2] they could, without acquiescing in the abandonment, re-enter and relet and hold the tenants for any deficiency in rent; or [3] they could refuse to re-enter, allow the premises to remain vacant, and hold the tenants for the full rent.

*Cohen v. Food Town, Inc., supra,* 207 A.2d at 123. The trial court in the instant case clearly followed *Cohen* in holding "that once a landlord does relet the abandoned premises, he can no longer hold the original tenant for the full amount of the rent, rather only for the deficiency; he must credit him with the amount received from the reletting." Further, while recognizing that a landlord is not required to relet premises which are abandoned before the expiration of the lease, *Friedman v. Thomas J. Fisher & Co.*, 88 A.2d 321, 323 (D.C. 1952),[3] the trial court held that, since a landlord who relets is only entitled to recover the difference between the amount he would have received under the first lease and the amount he actually receives under the second, it follows logically that when a landlord benefits financially from abandonment of the premises by the original tenant, he suffers no damages, and is not entitled to recover any money from that tenant.

▬ Appellants protest, however, that in reaching its conclusion, the trial court relied on *Wanderer v. Plainfield Carton Corp.*, 40 Ill.App.3d 552, 351 N.E.2d 630, 635 (1976), which they contend represents a minority view not shared by the District of Columbia. The *Wanderer* court held that a landlord was required to credit the first tenant with the amount of the excess rent realized from a substitute tenant to whom

---

**2.** Appellants' claim that the trial court erred in permitting appellee to interpose a "no damages" defense after the pretrial statements had been filed is without merit. The pretrial order provided that appellee could submit, on the day of trial, a memorandum delineating "any special legal matters." Thus there is no basis to hold that appellee's activities were inconsistent with the pretrial order or that the trial court erred. *Redding v. Capital Cab Co.*, 284 A.2d 54, 55 (D.C.1971). Appellants did not object to the pretrial order, and the trial court permitted appellants to file a memorandum in response to appellee's no-damages defense before ruling on the merits. They thus suffered no prejudice and cannot claim they were unfairly surprised in urging their position in the trial court; appel-

lants supplied appellee with the information about the new lease, and appellee's pretrial statement referred to the fact that if appellants had promptly relet the property, the damages could have been completely mitigated.

**3.** *See also Simons v. Federal Bar Bldg. Corp.*, 275 A.2d 545, 550 (D.C.1971) (upholding a trial judge's refusal to instruct the jury that the landlord had any duty to mitigate damages); *McIntosh v. Gitomer*, 120 A.2d 205, 206 (D.C.1956) (while a tenant cannot relieve himself from rent obligations by abandoning the property, a landlord who reserves the right to relet has a duty to minimize damages by reletting).

landlord had relet the abandoned property.[4] Appellants here rely on *Diatz v. Washington Technical School,* 73 A.2d 718 (D.C. 1950) for the proposition that abandonment does not relieve a tenant of liability for rent for the remainder of the term. We do not disagree. However, appellants also contend that while a landlord's acceptance of an abandonment by a tenant would, under *Ostrow v. Smulkin,* 249 A.2d 520 (D.C. 1969), result in the measure of damages as contract damages, there is no factual basis to show that they accepted surrender of the property and, therefore, they are entitled to recover the full rent due from the date of abandonment until the date of reletting. We disagree. The record clearly shows acceptance by appellants. In July 1979 they re-entered the property, erected a sign and actively sought to relet the premises. *See Annot.,* 21 A.L.R.3d 534, 556 n. 7 (a "reentry" occurs at least where landlord attempts to relet premises).

■ Hence, the only issue is whether the long established rule in the District of Columbia regarding the options available to a landlord upon a tenant's wrongful abandonment should be modified when the landlord has gained an unanticipated net profit under a new lease. We are unpersuaded it should be. In *Ostrow v. Smulkin, supra,* 249 A.2d at 520, this court described the basic ingredients of a tenancy as consisting of the tenant's entitlement to possession and the landlord's entitlement to rent, but pointed out that

> [i]f the landlord retakes possession by legal process or by accepting a voluntary surrender of possession by the tenant, the obligation of the tenant to pay future rent ceases.... And depending on the

circumstances and contractual provisions of the lease, the tenant may be liable for damages even after the landlord has retaken possession, but this liability is for breach of contract and not for rent. *Id.* at 521.

■ "In fixing the amount of damages, the general purpose of the law is, and should be," according to Professor Williston, "to give compensation, that is, to put the plaintiff in as good a position as he would have been had the defendant kept his contract." 11 WILLISTON ON CONTRACTS § 1338 at 198 (3d ed. 1968). "[C]ompensation involves not only assessment of gains prevented by the breach but also of losses ensuing which would not have occurred had the contract been performed. From these must be deducted any saving to the plaintiff due to the non-performance of the contract. The result will give the net loss to the injured party." *Id.* at 202–03 (citing the RESTATEMENT OF CONTRACTS § 329). Moreover, while in some instances any "saving may be merely negative in being freed from the necessity of performance, [i]t may, however take a positive form when this freedom enables the injured party to acquire pecuniary advantages which he otherwise would not have been able to obtain." *Id.* at 203 n. 16.[5] The cases relied upon by appellants are not to the contrary. For example, in *Whitcomb v. Brant,* 100 A. 175 (N.J.1917), cited by appellants, the court affirmed dismissal of a suit by the original tenant to recover the incidental profits realized by the landlord upon his reletting of the premises to another tenant. The court held that after the landlord had obtained a new tenant and applied the rent received from the

---

4. The *Wanderer* court also held the first tenant was liable for the landlord's costs in reletting the premises and would not be relieved of its obligation for any deficiencies resulting from the reletting if the new tenant abandoned the premises during the original lease term. 351 N.E.2d at 636. The latter circumstances is not present in the instant case since appellants' counsel conceded at oral argument that appellants have received the rents referred to in the trial court's opinion from the substitute tenant.

5. *Cf. Lee v. Foote,* 481 A.2d 484, 486 (D.C.1984) (restitution allowed for harm caused in order to put plaintiff in position he would have been had the contract been performed); *Fateh v. Rich,* 481 A.2d 464, 472 (D.C.1984) (where vendor retakes control of premises, vendee has burden to show vendor's recovery should be adjusted to prevent unjust enrichment).

second tenant to relieve the original tenant of his obligation to pay rent, that was the extent to which the original tenant was entitled to benefit. The trial court did no more in the instant case.

■ The record supports the trial court's findings, Super.Ct.Civ.R. 52, and we find no error of law. D.C.Code § 17–305(a) (1981). Accordingly, the judgment below is affirmed.